UNITED STATES of America,

v.

Maria HSIA, Defendant.

No. CRIM. 98–0057(PLF).

United States District Court,
District of Columbia.

Jan. 31, 2001.

John M. McEnany, Trial Attorney, Public Integrity Section, Campaign Financing Task Force, Criminal Division, U.S. Department of Justice, for Government.

Nancy Luque, Andrew L. Hurst, Reed Smith Shaw & McClay, Washington, DC, for Defendant.

## OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

By order of December 18, 2000, the Court referred defendant Maria Hsia's motion for a *Kastigar* hearing to Magistrate Judge John Facciola pursuant to 28 U.S.C. § 636(b) and Rule 57.19(a)(1) of the Local Criminal Rules of this Court. Magistrate Judge Facciola was directed to conduct a *Kastigar* hearing and to submit findings of fact and recommendations to this Court. The magistrate judge conducted the hearing over two days, on January 10 and 11, 2001. He heard the testimony of Campaign Financing Task Force attorneys John M. McEnany and Eric L. Yaffe, the prosecutors responsible for this case; Robert Conrad, the Chief of the Campaign Financing Task Force; and Daniel O'Brien, the Assistant United States Attorney in Los Angeles, California responsible for a related investigation in which Ms. Hsia was subpoenaed to testify before a grand jury. The proceedings before Magistrate Judge Facciola were tape-recorded, transcribed, and now have been reviewed by this Court.

On January 15, 2001, Magistrate Judge Facciola issued his Report and Recommendation setting forth his 32 findings of fact, his analysis under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), his conclusion that there was a *Kastigar* violation and his recommendation that, as a remedy, the government be precluded from making one particular sentencing argument, an argument for an upward departure under Application Note 11 to Section 2F1.1 of the Sentencing Guidelines, that he found was based on a non-evidentiary use of Ms. Hsia's immunized grand jury testimony.

The government and the defendant each filed objections to Magistrate Judge Facciola's Report and Recommendation. The government argued both that the procedures it followed were fully sufficient to satisfy *Kastigar* and that, in any event, legal reasoning and argument can never be

suppressed under *Kastigar*. Defendant argued that Magistrate Judge Facciola did not go far enough, maintaining that all sentencing arguments propounded by the government and all prosecutors involved in this case have been tainted by the *Kastigar* violation. The Court heard argument on the parties' objections on January 22, 2001. Because it appeared at the hearing that the disputes about the facts found by the magistrate judge had been narrowed, the Court asked the parties to submit revised and supplemental objections which they now have done.

## I. FINDINGS OF FACT

The Federal Magistrates Act of 1968, 28 U.S.C. §§ 631 *et seq.*, permits a district court judge to designate a magistrate judge to conduct an evidentiary hearing in certain criminal matters and to submit proposed findings of fact and recommendations. *See* 28 U.S.C. § 636(b)(1)(B). Upon consideration of the magistrate judge's findings and recommendations and after considering objections filed by the parties, the district court judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made ... [and] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Our Local Criminal Rules have a parallel provision providing that the district court judge shall make "a *de novo* determination of those portions of a magistrate judge's findings and recommendations to which objection is made ...." LCrR 57.19(c). Applying these standards, the Court will accept all of Magistrate Judge Facciola's findings of fact as to which there is no objection and will review *de novo* only those findings as to which either side has objected.

The government did not object to any of the magistrate judge's findings of fact. Following the hearing before this Court on January 22, 2001, Ms. Hsia in her supplemental filing reiterated that she did not object to Findings 1–4, 6–7, 9, 13–15, 18–21, 23 and 30–32. In addition, she withdrew her earlier requests for clarification as to Findings 5, 8, 10, 12, 22, 24, 25 and 26. This Court therefore accepts and adopts those Findings made by Magistrate Judge Facciola in their entirety. It turns now to the contested findings.

*Finding 11:* Ms. Hsia requests that Finding 11 be modified to indicate that Mr. Conrad supervised both the investigation in this case and Mr. O'Brien's investigation in Los Angeles. The portion of the transcript cited by Ms. Hsia supports such a finding of fact. The Court concludes that there is no need to modify Finding 11, however, because as the government points out, Finding 2 indicates that Mr. Conrad supervised the investigation and trial in this case, and Finding 4 indicates that Mr. Conrad was also in charge of supervising the California Task Force investigation and that he supervised both the investigation of Ms. Hsia and the campaign financing investigation in a "hands on" fashion.

*Finding 16:* Ms. Hsia requests that Finding 16 be amended to include the following: "Mr. Conrad testified that he did not recall Mr. McEnany asking for help with Ms. Hsia's Sentencing before he contacted Mr. Yaffe to appear as a special attorney on behalf of the Department of Justice for this case. Mr. McEnany also stated that he was not advised that Mr. Conrad was considering bringing Mr. Yaffe back to assist with this case until after Mr. Conrad spoke with Mr. Yaffe about returning." Because the government acknowledges that these statements are substantially accurate, the Court will modify Finding 16 to include these facts.

*Finding 17:* Ms. Hsia requests that Finding 17 be amended to indicate that Mr. Conrad testified that he believed it to be a fair proposition to state that similarly situated defendants shall be treated the same by the Department of Justice. Upon review of the transcript, the Court agrees

with the government that the requested finding is a misleading or at least incomplete characterization of the testimony concerning the Task Force's position on sentencing in different cases. While at one point Mr. Conrad did agree "[a]s a general proposition" with defense counsel's assertion that similarly situated defendants should be treated similarly, Transcript of January 11, 2001, Hearing ("1/11/01 Tr.") at 90, his overall testimony was much more nuanced than defendant suggests and does not in context support her proposed factual finding. *See id.* at 82–104. The Court therefore rejects this request as not supported by the evidence and will not modify the magistrate judge's Finding 17.

*Finding 27:* The defendant requests that Finding 27 be modified to indicate that (1) the first meeting with Probation was in May 2000, and (2) at this meeting they discussed the matching funds issue and the "kingpin" adjustment in addition to Application Note 11. The Court will modify Finding 27 to indicate that the first meeting with Probation took place in May 2000. With respect to Ms. Hsia's second request, the Court will modify Finding 27 by adding the following sentence at the end of Finding 27: "The matching funds issue and the so-called 'kingpin' adjustment issue also were discussed at the May 2000 meeting with Probation."

*Findings 28 and 29:* Ms. Hsia requests that Findings 28 and 29 be modified to indicate that Mr. McEnany and Mr. Conrad discussed not only the proper measure of loss under Application Note 11, as found by Magistrate Judge Facciola, but also that Mr. Conrad discussed everything that was contained in the government's Sentencing Memorandum with Mr. McEnany and/or Mr. Yaffe. She maintains that Mr. Conrad testified that he suggested some of the language to be used in the government's Sentencing Memorandum without limiting his suggestions to Application Note 11 issues. The government resists these requests for modification, maintaining that Magistrate Judge Facciola's characterization of the testimony is more accurate.

The Court has now reviewed the relevant portions of the transcript and finds that Mr. McEnany would have taken the very same positions ultimately taken in sentencing except for the Application Note 11 argument if he had never spoken to Mr. Conrad. Transcript of January 10, 2001, Hearing at 106–08. Furthermore, while Mr. Conrad did discuss "everything that was contained in [the] sentencing memorandum" with Mr. McEnany and Mr. Yaffe, he testified without contradiction that the "most substantive discussions" he had with them related to Application Note 11 and that he expressed the opinion that "the most appropriate measure of loss was an analogy to the fraud tables in a dollar to dollar fashion." 1/11/01 Tr. at 25–27. Furthermore, Mr. Conrad reviewed the government's Sentencing Memorandum but did not write it, edit it or add to it. *Id.* at 30. Findings 28 and 29 are amended by adding these additional findings to those facts found by the magistrate judge.

*Proposed Finding 33:* The defendant proposes an additional finding of fact, proposed Finding 33, which attempts to set forth a revised chronology of events beginning with Ms. Hsia's appearance before the grand jury in Los Angeles and including her various meetings with the Probation Office. The government objects to some portions of Ms Hsia's proposal, arguing that the transcript does not support some of it and that other portions are either incomplete or already dealt with in the Findings of the magistrate judge. The Court will adopt Ms. Hsia's proposal in a modified fashion and finds the following fact which will be added as Finding 33:

33. The chronology of relevant events is as follows:

(1) April 4 and April 11, 2000: Ms. Hsia appeared to testify before the grand jury in Los Angeles;

(2) Sometime between April 4 and April 18, 2000: Mr. Conrad spoke with Mr. O'Brien about Ms. Hsia's testimony;

(3) April 18, 2000: Mr. Conrad questioned former Vice–President Gore and, among many other unrelated matters, asked him about Ms. Hsia's ability to speak English;

(4) At some point after Ms. Hsia appeared before the grand jury, Mr. Yaffe spoke with Mr. O'Brien about Ms. Hsia's grand jury appearance, but they did not discuss the content of her testimony;

(5) May, 2000: Mr. McEnany and Mr. Yaffe first met with Probation Officer Theresa Brown;

(6) June 21, 2000: Mr. Conrad testified before the Subcommittee on Administrative Oversight and Courts of the Senate Committee on the Judiciary. *See* Memorandum Opinion and Order of December 18, 2000, at 6–8;

(7) September, 2000: Mr. Conrad contacted Mr. Yaffe to ask him to become a special Justice Department attorney to assist in sentencing matters in this case (*see* Finding 16);

(8) November 8, 2000: Probation Officer Brown received Mr. McEnany's letter outlining the government's Sentencing Guideline recommendations.

■ *Proposed Findings 34–36:* With respect to the defendant's proposed Findings 34–36, relating to an analysis of other Campaign Financing Task Force plea agreements,[1] the Court concludes that it is more appropriate for the Court to take judicial notice of the plea agreements and to permit counsel for Ms. Hsia to make whatever legal arguments she wishes to make based upon these plea agreements, either in connection with the *Kastigar* issue or in connection with sentencing itself, rather than to make findings of fact based

on them. In addition, to the extent that the plea agreements are relied upon by the defendant to show vindictiveness on the part of the government, the Court does not believe that vindictiveness is a relevant factor in the *Kastigar* analysis. *See infra* at 200–201.

■ *The Government's Proposed Additional Evidence:* Subsequent to the hearing before Magistrate Judge Facciola, the government submitted the Affirmation of Michael E. Horowitz, Chief of Staff to the Assistant Attorney General for the Criminal Division, Department of Justice. While the defendant objects to the Court's considering this Affirmation, both the Federal Magistrates Act and our Local Rules permit the district court judge, upon reviewing a report and recommendation of a magistrate judge, to receive further evidence. *See* 28 U.S.C. § 636(b)(1); Local Criminal Rule 57.19(c). Accordingly, the Court will consider Mr. Horowitz's Affirmation for what it is worth and makes the following additional Finding of Fact based on that Affirmation:

34. Sometime in or about November 2000, Michael E. Horowitz, Chief of Staff to the Assistant Attorney General for the Criminal Division, United States Department of Justice, authorized Robert Conrad to pursue an upward departure theory in Maria Hsia's case based upon a dollar for dollar analogy to the fraud tables found in Section 2F1.1 of the United States Sentencing Guidelines. While Mr. Horowitz states that in authorizing Mr. Conrad to take such action Ms. Hsia's grand jury testimony had nothing to do with his views on the matter, there is nothing in the record to indicate whether Mr. Horowitz did or did not know about her grand jury testimony or whether he and Mr. Conrad discussed her testimony or her appearance before the grand jury. Nor is there anything in the record as to who

---

1. There is a dispute between the defendant and the government as to whether the cases

of Nora Lum and Gene Lum should be considered as Task Force cases.

broached the subject of an upward departure in the first place, Mr. Horowitz or Mr. Conrad.

## II. ANALYSIS

The Court has reviewed Magistrate Judge Facciola's conclusions of law as set forth in his Report and Recommendation and has carefully considered the objections of the government and the defendant along with the relevant case law. The Court has reviewed the magistrate judge's analysis *de novo* in view of the facts he found, as modified by the additional and modified Findings of Fact set out in Part I of this Opinion. The Court agrees with the analysis and conclusions of Magistrate Judge Facciola substantially for the reasons given by him and therefore will suppress all references, oral and written, to the Application Note 11 sentencing argument and will not consider the government's request for an upward departure on that basis.

As Magistrate Judge Facciola pointed out, no one is suggesting that Ms. Hsia's Fifth Amendment rights were violated by the direct use of her immunized testimony at her grand jury appearance in Los Angeles. Mr. Conrad, Mr. McEnany and Mr. Yaffe have never even read the transcript of her grand jury testimony, nor have any of them discussed the substance of it with Mr. O'Brien.[2] As a result, Ms. Hsia does not claim that the evidence upon which the government relies in connection with sentencing "came from her own mouth." Report and Recommendation at 10. Rather, Ms. Hsia's argument is "more complicated and subtle." *Id.* She maintains that all of the arguments made by the government in connection with sentencing are "a product of her grand jury appearance in the sense that the government was motivated to make those arguments because of its perception that she was insincerely asserting language difficulties and thereby evading her obligation to testify truthfully under the immunity order." *Id.* According to her, the novel Application Note 11 argu-

ment made by the government in this case—as well as other arguments regarding matching funds, more than minimal planning, and aggravated role in the offense—constitutes non-evidentiary use of her immunized testimony that is prohibited by *Kastigar.*

The government has three responses to Ms. Hsia's *Kastigar* argument. First, it asserts that there is no basis in the record for the suggestion that Mr. Conrad was motivated by vindictiveness in discussing with his colleagues a possible departure under Application Note 11 to Section 2F1.1 of the Sentencing Guidelines. Second, the government maintains that it followed adequate procedures and took precautions that were fully sufficient under the immunity statute and *Kastigar.* Third, the government argues that even if *Kastigar* has been violated there can never be a justification for suppressing legal analysis, legal reasoning or a legal position or argument. Alternatively, and in response to the defendant's objections to Magistrate Judge Facciola's Report and Recommendation, the defendant argues that even if this Court were to suppress and decline to consider the Application Note 11 argument, there is no reason on the basis of the record developed before the magistrate judge to suppress any other sentencing arguments propounded by the government. The Court will address each of these arguments in turn.

The government's first contention—that the magistrate judge erred because there was no evidence before him that any actions taken by Mr. Conrad were motivated by vindictiveness—is easily disposed of. This Court has decided on at least four prior occasions that Ms. Hsia was not selectively prosecuted and that the government has not acted out of vindictiveness. *See United States v. Hsia,* 24 F.Supp.2d 33, 47–52 (D.D.C.1998) (denying motion to dismiss indictment on grounds of selective prosecution); *United States v. Hsia,* 24

---

**2.** In addition, Ms. Hsia produced no docu-   ments for the grand jury's examination.

F.Supp.2d 63 (D.D.C.1998) (denying motion to reconsider decision denying motion to dismiss); Order of Jan. 21, 2000 (denying renewed motion to dismiss indictment on grounds of selective prosecution); Memorandum Opinion and Order of Dec. 18, 2000 (denying motion to dismiss indictment or disqualify Department of Justice on grounds of prosecutorial misconduct and conflict of interest). But the motivation or vindictiveness of the prosecutor is not the issue under *Kastigar*. What matters is whether the compelled testimony is used "in any respect," *Kastigar v. United States*, 406 U.S. at 453, 92 S.Ct. 1653, 32 L.Ed.2d 212, not the good or bad faith of the prosecutor who uses it.

■ If one thing is absolutely clear from the Supreme Court's decision in *Kastigar*, it is that a prosecutor's motive for using immunized testimony is irrelevant:

> The total prohibition on use provides a comprehensive safeguard, .... A person accorded this [use] immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.

*Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. 1653. Indeed, at least one court has held that the federal use immunity statute is violated even when a prosecutor operating in the best of faith reviews immunized testimony by mistake, without knowing that it was compelled, *see United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973), and our court of appeals has endorsed that view: "The prosecutor's knowledge (or lack thereof) that the testimony was immunized is relevant to the question of prosecutorial good faith, not prosecutorial use. The Fifth Amendment ... can be violated whether or not the prosecutor has knowledge that the testimony is immunized ...." *United States v. North*, 910 F.2d 843, 859 (D.C.Cir.1990). *Kastigar* prohibits any use of immunized testimony; a prosecutor's motivation in using it is beside the point. *See id.* at 861.

■ The government's second argument—that the procedures it took were fully sufficient to satisfy *Kastigar*—must be rejected based on the D.C. Circuit's interpretation of *Kastigar* in *United States v. North*, 910 F.2d 843 (D.C.Cir.1990). While the court in *North* did not go so far as to state that the careful precautions taken by the Independent Counsel in that case were insufficient on their face to satisfy *Kastigar*, the barriers it established for a hearing on remand made it virtually impossible for the Independent Counsel to meet his "heavy burden" under *Kastigar* to prove that "all of the evidence [he] propose[d] to use was derived from legitimate independent sources." *United States v. North*, 910 F.2d at 854 (quoting *Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. 1653). Under *North*, unless every "i" is dotted and every "t" is crossed, the government has an almost insurmountable burden to demonstrate that the use of immunized testimony, no matter how indirect, has not been tainted by knowledge of the grand jury testimony and proceedings. *See United States v. North*, 910 F.2d at 872–73.

In this case, the government cannot satisfy *North* because it took no steps at all to insulate Mr. Conrad from either the proceedings in this case or the proceedings in Los Angeles. Mr. Conrad was briefed by Assistant U.S. Attorney O'Brien on Ms. Hsia's grand jury appearance and on Mr. O'Brien's belief that she had feigned difficulty with the English language to avoid answering his questions, at the very same time that Mr. Conrad was supervising Mr. McEnany and Mr. Yaffe with respect to sentencing in this case. There was no effort made to inject a different supervisor into one or the other of these two proceedings or to remove Mr. Conrad from any involvement in the development of legal arguments in connection with the sentencing in this case after he learned the details of Ms. Hsia's grand jury appearance and was discussing possible remedies, including possibly contempt, with Mr. O'Brien.

While Mr. O'Brien and Mr. Conrad agreed that Mr. O'Brien would not speak with Mr. McEnany or Mr. Yaffe about the substance of Ms. Hsia's grand jury testimony, no formal measures were put in place to ensure that Ms. Hsia's immunized testimony was kept separate from the government's sentencing process, particularly with respect to Mr. Conrad's involvement in both. *See* Report and Recommendation at 205. There is no evidence in the record that establishes an independent basis for Mr. Conrad's non-evidentiary use of Ms. Hsia's compelled grand jury testimony or information derived therefrom, and all of the "circumstantial evidence suggests the precise contrary." *Id.* at 209 (summarizing evidence). The Court must conclude that the government has failed to carry its heavy burden of proving independent source.

■ The government next argues that even if there were a violation of *Kastigar*, legal reasoning or argument can never be suppressed; and it rightly points out that neither the defendant nor the magistrate judge has cited any case that directly supports such suppression. The government then cites a number of cases that suggest by analogy that such non-evidentiary use is not prohibited by *Kastigar* and points out that the D.C. Circuit in *North* never reached the issue. *See United States v. North,* 910 F.2d at 856 (court "assum[ed] without deciding" that government cannot make non-evidentiary use of immunized testimony). While the question is a difficult one on which the government might well prevail in other circuits, the reasoning of the D.C. Circuit and the requirements it imposed in *North* represent the most rigorous application of the core principle of *Kastigar*, that the federal immunity statute withstands constitutional scrutiny only because it provides "a sweeping proscription of *any use*, direct or indirect, of the compelled testimony and any information derived therefrom." *Kastigar v. United States,* 406 U.S. at 460, 92 S.Ct. 1653 (em-

phasis added). *See United States v. North,* 920 F.2d 940, 948 (D.C.Cir.1990).

■ In discussing the split in the circuits on the issue of non-evidentiary use in *North,* the court clearly rejected the analysis of the cases on which the government primarily relies here and embraced those cases whose reasoning suggests (although none has directly decided) that Magistrate Judge Facciola's analysis is the correct one. *See United States v. North,* 910 F.2d at 857–60. As the magistrate judge said, "*Kastigar* prohibits the use of immunized testimony in the broadest possible terms. There is nothing in that decision or its progeny that permits an artificial distinction between non-evidentiary and evidentiary use that could relieve a court of *Kastigar*'s unequivocal command." Report and Recommendation at 210 (citation omitted). *Kastigar* bars the use of compelled testimony to pursue investigatory leads, to focus the investigation on the witness who was compelled to testify, and the like. *Kastigar v. United States,* 406 U.S. at 460, 92 S.Ct. 1653. It bars the use of compelled testimony to refresh a witness's recollection, to plan trial strategy, to decide whether to plea bargain, to shape opening statements and closing arguments, or for other strategic purposes. *See United States v. North,* 910 F.2d at 857–58, 862–63. *Kastigar* even bars the testimony of a trial witness whose decision to testify "was *motivated by*, and therefore indirectly derived from," immunized statements. *United States v. North,* 920 F.2d at 942 (quoting *United States v. Rinaldi,* 808 F.2d 1579, 1584 n. 7 (D.C.Cir.1987) (emphasis added by D.C. Circuit)).

The Court sees no distinction between these uses and the development of sentencing arguments and strategy. Because not just testimony but any "information" obtained or derived, "directly or indirectly," from immunized testimony may not be used in any way in a criminal case, *United States v. North,* 910 F.2d at 857, the non-evidentiary use proposed by the government in this case cannot be permitted. *Id.*

at 858 (compelled testimony cannot be used "in *any* respect") (quoting *Kastigar v. United States*, 406 U .S. at 460, 92 S.Ct. 1653 (emphasis in original)). In view of the government's "affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony," *Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. 1653, the Court will suppress all reliance by the government at sentencing, both written and oral, on the Application Note 11 argument and will not consider it in connection with sentencing in this case.

■ The defendant argues that if the Court suppresses the Application Note 11 argument it necessarily must suppress every other argument made by the government in support of its sentencing recommendations. She maintains that once Mr. Conrad spoke with Mr. O'Brien about Ms. Hsia's grand jury appearance he was tainted; and to the extent that he participated at all in developing the government's sentencing position through his suggestions to or conversations with Mr. McEnany and Mr. Yaffe, all arguments presented by any of them constitute non-evidentiary use of Ms. Hsia's immunized testimony. That conclusion does not follow from the facts as found by Magistrate Judge Facciola and as modified by this Court, however, because the evidence presented demonstrates "that the government would have made all the other sentencing arguments whether or not Conrad had or had not supervised the preparation of the letter to Probation of November 8, 2000." Report and Recommendation at 13. On this issue the government has met its burden.

This Court's review of the transcript of the hearing before the magistrate judge makes clear that Mr. Conrad's substantive input was limited to the "dollar for dollar" Application Note 11 argument only, that Mr. Conrad did not write, edit or add to the government's letter to the Probation Office or its Sentencing Memorandum, and that Mr. McEnany would have taken the very same positions in sentencing except

for the Application Note 11 argument even if he had never spoken to Mr. Conrad. *See* Report and Recommendation at 206–208; *supra* at 198. The magistrate judge therefore limited the remedy for the *Kastigar* violation he found to the suppression of the Application Note 11 argument because he was convinced "that the government would have made the other arguments whether Hsia testified [before the grand jury] or not. To grant Hsia any greater remedy would be to improve her sentencing position merely because she testified in the grand jury," a remedy to which she is not entitled under the use immunity statute or under *Kastigar*. Report and Recommendation at 210. Having reviewed the evidence *de novo* and announced its own additional and modified Findings of Fact, this Court reaches the same conclusion. *Kastigar* requires suppression of the Application Note 11 argument only, nothing more. For all of these reasons, it is hereby

ORDERED that the magistrate judge's Report and Recommendation, as modified in Part I of this Opinion, is ACCEPTED; and it is

FURTHER ORDERED that the government is precluded from making any argument at sentencing regarding an upward departure pursuant to Application Note 11 to Section 2F1.1 of the United States Sentencing Guidelines.

SO ORDERED.

## REPORT AND RECOMMENDATION

FACCIOLA, United States Magistrate Judge.

This matter has been referred to me by Judge Friedman for resolution of the *Kastigar* issue that have arisen in the case. The Defendant, Maria Hsia, complains that her Fifth Amendment rights have been violated by being called before a Grand Jury, compelled to give testimony under a grant of immunity, and subjected to the improper use of that immunized

testimony by prosecutors at her sentencing. On January 10 and 11, 2001, I conducted a *Kastigar* hearing on this matter to determine whether or not Hsia's Fifth Amendment rights had in fact been violated. Below follows my Findings of Fact and Analysis explaining my ultimate conclusion that one of the government's arguments at sentencing should be suppressed.

## FINDINGS OF FACT

1. On March 3, 2000, the trial in *United States v. Hsia* concluded in a guilty verdict.

2. The Campaign Financing Task Force attorneys in charge of investigating and prosecuting Hsia were John McEnany and Eric Yaffe. Robert Conrad, presently the Chief of the Task Force, supervised McEnany and Yaffe through the trial to the present time.

3. Contemporaneous with the investigation of Hsia, the Task Force was investigating certain other campaign contributions. This investigation was being conducted primarily in California by Assistant United States Attorney Daniel O'Brien.

4. Conrad was also in charge of supervising the California Task Force investigation. Conrad testified to supervising both the Task Force's investigation of Hsia and the California campaign finance investigation in a "hands on" fashion.

5. Subsequent to Hsia's trial and conviction, O'Brien determined that Hsia might be able to provide valuable information to his California investigation and decided to seek her cooperation. Through her counsel, however, Hsia declined to cooperate. The Task Force then determined to compel her testimony by seeking an order granting her immunity. The order was secured and Hsia was called before the Grand Jury in California. O'Brien interrogated her before the Grand Jury.

6. At the insistence of Hsia's counsel, Nancy Luque, who complained on behalf of her client about the services of the interpreter who was assisting Hsia in the Grand Jury room, Hsia's first appearance before the Grand Jury was continued.

7. At one point after Hsia's initial grand jury appearance, Conrad and O'Brien discussed Hsia's language difficulties and the need to adjourn her first appearance because of them.

8. Conrad recalled that O'Brien articulated the perception that Hsia was not sincere in her complaints about having difficulties understanding O'Brien's questions. The two men discussed the remedies available to them because of Hsia's perceived lack of cooperation, which could be deemed a violation of the order granting her immunity and directing her to testify. They ultimately decided not to seek a contempt finding.

9. In seeking Hsia's testimony before the grand jury, O'Brien had expressed to Conrad O'Brien's concern that Hsia's status as a convicted but yet to be sentenced defendant could potentially raise problems of her grand jury testimony tainting the government's position at sentencing. O'Brien indicated that a cautious approach was appropriate, like a man who wears a belt and suspenders.

10. To that end, O'Brien discussed with Conrad whether an "ethical wall" should be erected. By this, O'Brien meant that there would be one person to whom the lawyers working on the California investigation and the lawyers working on the Hsia sentencing would report. That one person alone would determine whether information secured by one of the teams of the lawyers

would be shared with the other team.

11. While no attorney was expressly appointed in that capacity, O'Brien believed on the basis of his conversation with Conrad that Conrad would function in that capacity or, at least, would prevent the information gathered from the California grand jury from being disseminated improperly. Further, O'Brien and Conrad agreed that O'Brien would not speak with the Washington prosecutors, McEnany and Yaffe, about Hsia's Grand Jury testimony.

12. No formal measures were put in place to shield the prosecutors in the Hsia case from Hsia's immunized testimony. McEnany, Yaffe, Conrad and O'Brien indicated that no one ever took any formal steps, by way of memoranda or other formal measures such as initialing and dating documents, to ensure that Ms. Hsia's immunized testimony was kept separate from the government's sentencing process. The attorneys recalled oral communications in which they warned one another not to discuss the substance of Hsia's testimony. O'Brien recalled reminding Yaffe and McEnany on several occasions that they were not to discuss the substance of Hsia's immunized testimony. However, the attorneys did not recall making any written notation of these or other discussions related to Hsia's immunized testimony.

13. After Hsia's grand jury testimony, both Yaffe and McEnany recalled having phone conversations with O'Brien in which Yaffe and McEnany discussed Hsia's appearance before the Grand Jury. Neither attorney recalled ever discussing the substance of Hsia's testimony with O'Brien. Both attorneys were aware that Hsia had appeared be-

fore the Grand Jury and that her testimony was immunized.

14. On April 18, 2000, subsequent to Hsia's Grand Jury appearance, Conrad interviewed Vice President Gore in connection with the Campaign Finance investigations and specifically, the Hsi Lai Temple. Conrad testified that he knew from his prior conversation with O'Brien regarding Hsia's testimony before the Grand Jury that O'Brien felt that Hsia was insincere in her protestations that she did not understand English. During that conversation, Conrad recalled sharing his observation of Hsia in Washington, DC in which Hsia seemed able to understand English.

15. During his interview with Vice President Gore, Conrad specifically spoke with Gore about Hsia's ability to speak English. Conrad confirmed that his very first question posed to Vice President Gore about Ms. Hsia related to Hsia's ability to speak English. Conrad testified that he asked the Vice President about Hsia's English-speaking abilities as a way to pursue O'Brien's skepticism about Hsia's difficulties during the Grand Jury testimony. Conrad also recalled wanting to inform his own understanding of her English-speaking abilities.

16. After Hsia's conviction, Yaffe resigned and entered into private practice. Sometime in September 2000, Conrad decided that he wanted to have second lawyer work with McEnany in the sentencing phase of the Hsia case. He convinced Yaffe to return to the Task Force as a special Assistant United States Attorney. Conrad recalled wanting Yaffe to return to the case because the Task Force was short-staffed, and Yaffe had the knowledge and skill he believed important to the case.

17. In conversations between Conrad and Yaffe, both in connection with Yaffe's return and subsequent discussions, the two men spoke about what the government's position should be in seeking upward departures in Hsia's sentencing. Yaffe recalled that Conrad was interested in making sure the government took the appropriate position on upward departure. Specifically, according to Yaffe, their conversations concerned whether the United States Sentencing Guidelines ("the Guidelines") properly took into account Hsia's conduct as well as the kind of loss that had occurred.

18. On November 8, 2000, the Task Force transmitted to the United States Probation Office its preliminary Guidelines analysis in the Hsia case. In that document, prepared in its first draft form by McEnany, the Task Force first proffered relevant conduct which was not based on evidence at the trial but which the Task Force proffered as to what it could prove at a sentencing hearing. These acts were based on evidence gathered during the investigation of Ms. Hsia's activities which would have been offered into evidence at a trial had other charges against Ms. Hsia not been dismissed on the Task Force's motion.

19. The government then discussed application of the Guidelines. In this analysis, the Task Force indicated that because there was no guideline specifically applicable to campaign financing offenses, § 2F1.1 of the Sentencing Guidelines was the governing guideline, and the five counts of conviction and the relevant conduct would be grouped under U.S.S.G. § 3D1.2(d) and U.S.S.G. § 1B1.3(a)(2). *Letter of November 8, 2000* at 3–4.

20. The base offense level thus derived under § 2F1.1 was, according to the Task Force, to be increased by one level for a loss of $3,250 in presidential matching funds and then by an additional two levels for "more than minimal planning." *Id.* at 4.

21. The Task Force then sought an adjustments upward of four levels because the defendant was an "organizer" of a criminal activity that was "otherwise extensive," thereby raising the offense level to 13. *Id.*

22. The Task Force finally argued that Application Note 11 to § 2F1.1 permitted an upward adjustment in cases in which the loss determination did not fully "capture the harmfulness and seriousness of the conduct." The Task Force argued that this was such a case and that "the upward departure should be based on equivalence of the total amount of illegal conduit payments to the loss table in § 2F1.1." *Id.* at 5.

23. Since the contributions involved in the counts of conviction and the relevant conduct totaled $139,5000, the Task Force insisted that there should be a loss equivalent in that amount, which under the table in § 2F1.1 resulted in an upward departure of seven, which lead to a total offense level of 20. In other words, under the Task Force's analysis, Hsia should be treated as if she had, for example, stolen $139,500.

24. Conrad played a significant role in the articulation of the Task Force's position with respect to upward departure under Application Note 11. According to Conrad, he reviewed the draft of the November 8th letter to probation and discussed with Yaffe and McEnany the arguments being made. Conrad did not recall a specific discussion about the let-

ter, but rather a general conversation about the substance of the information contained in the letter.

25. Conrad testified that he did not add to or make direct changes to the letter. He recalled having a discussion about the amount of upward departure, both before and after the time of the letter. Conrad testified that the argument most logical to him with respect to upward departure was the dollar for dollar analogy to the Fraud tables. He further testified that he viewed the letter as part of an ongoing debate about the proper measure for departure in Hsia's case.

26. According to McEnany, he and Conrad reviewed the letter together and made changes. McEnany recalled drafting the letter, showing it to Conrad, and having a discussion with Conrad that focused primarily on what the appropriate measure for upward departure should be under Application Note 11. McEnany recalled that the changes that he and Conrad made together related to the proper measure of upward departure and the fact that the presidential matching funds issue should be considered separately from upward departure.

27. McEnany further recalled that the issue of separating the matching funds loss from the upward departure argument was Conrad's idea. According to McEnany, the attorneys discussed Application Note 11 at the first meeting with probation, but McEnany attributed to Conrad the belief that the appropriate measure under Application Note 11 would be dollar for dollar. McEnany testified that this was an area in which Conrad changed McEnany's original position. According to McEnany, this change resulted in an increase of about six offense levels, plus or minus one.

28. The principal area of ongoing discussion between McEnany, Yaffe and Conrad with respect to Hsia's sentencing was the proper measure under Application Note 11. The main point of Conrad's supervision in the Hsia sentencing, according to McEnany, was with respect to Application Note 11. McEnany recalled that Conrad's level of supervision as to everything else in the sentencing was very little.

29. Unlike the discussion of the upward adjustment under Application Note 11, the so-called Kingpin adjustment, or organizer role, was not the subject of much debate. Conrad did not recall whose idea the Kingpin adjustment was. He recalled that it was not a very disputed issue among Yaffe, McEnany and himself. Further, he recalled that the Kingpin argument was most likely part of the November 8th letter that he reviewed with McEnany. McEnany confirmed that the Kingpin adjustment was one of the points from McEnany's letter to probation that was never particularly discussed with Conrad.

30. Conrad testified that he approached his conversations with McEnany and Yaffe with respect to Hsia's sentencing in a consensus-building manner. He testified that their relationship was "give and take." Conrad indicated that if there were strident disagreements between McEnany and Conrad, Conrad would have the ultimate say.

31. After McEnany submitted the letter to Probation and received a copy of Probation's draft Report, he recalled likely providing Conrad with a copy, and possibly discussing the "bottom line" with Conrad. McEnany recalled, however, that after receiving the Probation Report draft, he had more discussions

with Yaffe about it than with Conrad.

32. In comparing the government's position on Hsia's sentencing to other Campaign Finance Task Force cases, this is the first case the attorneys recall in which an upward adjustment on a dollar for dollar basis has been argued. Conrad testified that upward departures have been argued for in several cases, but the way in which the departure is measured in Hsia's case is "different." Conrad did not recall another case in which the government argued for the use of the Fraud table by analogy, and the dollar for dollar departure, even in cases where the dollar amount was significantly higher.

## ANALYSIS

In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that the "use immunity" created by 18 U.S.C.A. § 6002 (2000) was co-extensive with the Fifth Amendment protection against self incrimination, provided no use was made by the government of the immunized testimony. *Kastigar,* 406 U.S. at 453, 92 S.Ct. 1653. *Kastigar* dealt with the actual receipt into evidence of the immunized testimony against the defendant or the development of investigative leads from its use. To insure that the immunity granted is in fact co-extensive with the constitutional protection against self-incrimination, *Kastigar* imposes upon the government the heavy burden of establishing by a preponderance of evidence a source independent of the defendant's immunized testimony for all of its evidence against that defendant.

No one is suggesting in this case, however, that Hsia's Fifth Amendment rights were violated in this sense of direct use of her immunized testimony by her grand jury appearance to be now followed by her sentencing. While the government attorneys, except for O'Brien, have not read the transcript of her grand jury appearance in California, I have. She produced no documents for the grand jury's examination, and, to be blunt, said very little indeed about the topics O'Brien raised when he interrogated her. Thus, Hsia does not and cannot claim that the evidence upon which the government relies for its claims of relevant conduct, which it asserts should be considered at sentencing, came from her own mouth. Hsia has to concede that the government's securing of that evidence antedates her grand jury appearance.

The argument Hsia makes is more complicated and subtle. She insists that the arguments made by the government at sentencing are a product of her grand jury appearance in the sense that the government was motivated to make those arguments because of its perception that she was insincerely asserting language difficulties and thereby evading her obligation to testify truthfully under the immunity order. According to her, the harshness of the government's views as to an appropriate sentence for her are a product of her immunized testimony, a use as prohibited by *Kastigar* as tendering her grand jury testimony to the sentencing court.

In *United States v. North,* 910 F.2d 843, 856–59 (D.C.Cir.1990), the Court of Appeals explained the diametrically opposed views of the courts and commentators as to whether non-evidentiary use of immunized testimony fell within *Kastigar*'s ban on any use of such testimony. While it found that it was unnecessary to resolve that question, it dissociated itself from those courts which had held that non-evidentiary use of immunized testimony could never be use under *Kastigar;* the Court of Appeals found those decisions "troubling." *Id.* at 859–60. Thus, whatever may be the law in other Circuits, any government argument that the formation of Conrad's motivation could not be possible use under *Kastigar* has absolutely no precedent to support it; *North* points in the direction of viewing the question of "use" on a case by case basis.

If there is no precedential impediment to finding the formation of Conrad's motivation to be use, then one begins the *Kastigar* analysis with a determination of whether the government met its burden of showing an independent source for that motivation. If there was an independent source, then perhaps the question of whether the formation of that motivation was use could be avoided. It cannot, however. The only evidence proffered by Conrad in support of his assertion that O'Brien's telling Conrad that O'Brien thought Hsia insincere in her claim of having difficulties understanding O'Brien's question because of Hsia's language difficulties is Conrad's testimony at the hearing that it did not affect the way in which Conrad approached her sentencing. But, the courts have universally held that the government's protestation that the immunized testimony did not affect its prosecution of the immunized witness to be insufficient, no matter how sincere. *United States v. Hampton,* 775 F.2d 1479, 1485 (11th Cir.1985) ("[M]ere denials of use by the prosecutors and other government agents are generally insufficient to meet the government's burden, even if made in good faith."). *Accord United States v. Byrd,* 765 F.2d 1524, 1528 (11th Cir.1985); *United States v. Seiffert,* 463 F.2d 1089, 1092. (5th Cir.1972); *United States v. Nemes,* 555 F.2d 51, 55 (2d Cir.1977). As *North* itself holds, the government must point to evidence which establishes the independent basis for the use of the immunized testimony which is claimed to have been tainted by that testimony. *North,* 910 F.2d at 872. Here there is none, other than Conrad's protestation of no taint.

More to the point, as Hsia cogently points out, the circumstantial evidence suggests the precise contrary. First, O'Brien's telling Conrad that Hsia was pretending not to understand his questions is a serious allegation. The two men discussed the remedy of contempt proceedings. Any reasonable prosecutor would view such a pretense as an attempt to cover up what one knew, and such a prosecutor would understandably feel that a person who resorts to such tactics should feel the lash of the law at sentencing. Second, one of the most significant moments in Conrad's investigation had to be his interview of the Vice President. The first question Conrad asked the Vice President about Hsia was whether the Vice President believed that Hsia could understand and speak English. Third, when Conrad recruited Yaffe to return to the Task Force, Conrad emphasized the necessity of the government's seeking an upward departure in Hsia's sentence and whether the Guidelines took into account the nature of the loss truly suffered in the government's view. Fourth, while comparisons are odious, it is nevertheless true that Conrad, McEnany and Yaffe could not recall any other case subject to their jurisdiction in which the government asserted that the fraud table should be used to assess the loss amount so that the amount lost for Guidelines purpose equaled dollar for dollar the amount of the contributions illegally made. Conrad indicated. that this was true even though other cases involved greater contributions than the ones in Hsia's case.

The most objective view of this evidence is that, at the barest minimum, the evidence that Conrad was not motivated by Hsia's grand jury appearance to seek a harsher sentence is in equipoise with the evidence that he was. When the evidence is in equipoise, the party with the burden of proof has failed to carry it.[1] Since the government failed to carry its burden of proof, I must conclude that *Kastigar* bars the use claimed, assuming for the moment that Conrad's motivation is use.

---

1. Bar Association of the District of Columbia, *Standardized Civil Jury Instruction,* No. 2.8 (1998).

Since this use question cannot be avoided, I believe that it should be resolved in Hsia's favor. I begin by first indicating that the evidence before me permits me only to conclude that Conrad's only affirmative addition to the government's sentencing position was his argument that Application Note 11 to U.S.S.G. § 2F1.1 permitted the use of the table in that Guideline to ascertain the loss amount to be used in sentencing Hsia. The evidence before me convinces me that the government would have made all the other sentencing arguments whether or not Conrad had or had not supervised the preparation of the letter to Probation of November 8, 2000. I therefore would limit the remedy to the suppression of Conrad's addition because I am of the view that the government would have made the other arguments whether Hsia testified or not. To grant Hsia any greater remedy would be to improve her sentencing position merely because she testified in the grand jury. An immunized witness is entitled to be in substantially the same position she would have been had she not testified. *Kastigar*, 406 U.S. at 462, 92 S.Ct. 1653. She is not entitled to be in a better position by testifying than she would have been had she not testified. *See United States v. Apfelbaum*, 445 U.S. 115, 127, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

The narrowness of the remedy being imposed then compels the conclusion that it should be imposed even though it is suppressing a non-evidentiary use of Hsia's testimony. The only arguments made against suppressing non-evidentiary use of immunized testimony is that doing so grants the witness the very transactional immunity Congress eliminated when it enacted 18 U.S.C.A. § 6002 (2000). *See, e.g., United States v. Serrano*, 870 F.2d 1, 17 (1st Cir.1989); *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir.1988); *Byrd*, 765 F.2d at 1530. It is also said that, if non-evidentiary use is prohibited, there is a risk that the immunized witness's position might be better rather than the same as her position had she not testified, and

*Kastigar* requires only that her position be substantially the same. *Serrano*, 870 F.2d at 17; Gary S. Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment*, 66 Tex. L.Rev. 351, 379–382 (1987).

These concerns have nothing to do with the suppression I am ordering. First, Hsia is hardly being granted transactional immunity. She still faces sentencing and the necessity of meeting all the government's sentencing arguments except the one I am suppressing. Second, she is in precisely the same position she would have been had Conrad not made the addition he did. On the other hand, it is fatuous to say that Hsia's situation would be the same even if Conrad's addition was left in. She is after all facing an increase of seven levels in her offense level calculation if that addition is not suppressed.

Since there is no logical or legal impediment to doing so, the non-evidentiary use of her immunized testimony should be suppressed. *Kastigar* prohibits the use of immunized testimony in the broadest possible terms. *Kastigar*, 406 U.S at 453, 92 S.Ct. 1653 (prosecution prohibited from using the compelled testimony in any respect; Fifth Amendment insures that immunized testimony cannot lead to the infliction of criminal penalties on the witness). There is nothing in that decision or its progeny that permits an artificial distinction between non-evidentiary and evidentiary use that could relieve a court of *Kastigar*'s unequivocal command.

Finally, the desirability of avoiding another situation like this one in the future provides additional powerful motivation for this conclusion. The most maddening aspect of this case is how avoidable the problem was. The cases themselves speak of provisions in the United States Attorney's Manual which indicate that the Attorney General must approve the subsequent prosecution of a immunized witness and may withhold consent unless convinced that the prosecution team has made

diligent efforts to eliminate any possibility of the prosecution being tainted by that witness's immunized testimony. *United States v. Semkiw*, 712 F.2d 891, 894–95 (3d Cir.1983). Among the devices suggested to avoid taint are assigning the prosecution to entirely different prosecutors than those who interrogated the witness in the grand jury or had any exposure to the witness's testimony. *Id.* at 894.

It was one of the prosecutors in this case who spoke to Conrad of wearing a belt and suspenders and suggested the creation of an "ethical wall." The evidence before me convinced me that the prosecution of this case was entrusted to particularly experienced, skilled, and diligent prosecutors. Surely, the notion of an impregnable "Chinese wall" between the prosecutors handling the sentencing and those handling the grand jury appearance could not have been an alien concept. In fact, the only loss the government would have sustained by Conrad having absolutely no contact with O'Brien is that Conrad would not have supervised O'Brien's presentation of Hsia to the grand jury. But, Conrad could have had someone else supervise that one appearance by a witness. Even if O'Brien was not supervised in that one task, he was a skilled and experienced prosecutor and surely could have been entrusted with taking the proper action when she testified. The net loss to the government of creating a "Chinese wall" between O'Brien and Conrad was nugatory, if it was a loss at all.

On the other hand, the failure to erect that wall made necessary the inquiry into the prosecutor's motivation which was awkward and difficult particularly to a court which readily acknowledges the necessity of the Executive Branch functioning independently in exercising the prosecution function. The desirability of avoiding any similar inquiry in the future when doing so could have been so easily avoided provides additional and powerful stimulus to the conclusion I reach.

I therefore recommend that the government be precluded from making the argument advanced in paragraph "d." of its letter to the Probation Office on November 8, 2000, to wit:

**d. Departures** . . .

Application Note 11 to § 2F1.1 provides that "[i]n cases in which the loss determined under subsection (b)(1) does not full [sic] capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." The Government submits that this is such a case, and that the upward departure should be based on equivalence of the total amount of illegal conduct payments to the loss table in § 2F1.1. A loss equivalent of $139,500 would result in an upward departure of 7, for a total offense level of 20.

Jan. 15, 2001.